**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| HIGHVIEW POINT PARTNERS, LLC,[1] | Case No. 11-11432 (KJC) |
| Debtor. | **Objection Deadline: TBD**<br>**Hearing Date: TBD** |

### DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FREEH GROUP INTERNATIONAL SOLUTIONS, LLC AS CRISIS MANAGER TO THE DEBTOR AND DESIGNATING THE HONORABLE LOUIS J. FREEH AS CHIEF RESTRUCTURING OFFICER *NUNC PRO TUNC* TO MAY 6, 2011

Highview Point Partners, LLC (the "Debtor"), as debtor and debtor in possession in the above captioned Chapter 11 case, hereby submits this motion (the "Motion") pursuant to sections 363 and 105 of the Bankruptcy Code for entry of an order authorizing the Debtor's employment and retention of Freeh Group International Solutions, LLC ("FGIS") as its crisis manager in connection with this Chapter 11 case and designating the Honorable Louis J. Freeh as the Chief Restructuring Officer ("CRO") of the Debtor *nunc pro tunc* to May 6, 2011 (the "Petition Date"). Judge Freeh is a founder and principal of FGIS. In support of this Motion, the Debtor submits the Declaration of Louis J. Freeh (the "Freeh Retention Declaration"), attached hereto as <u>Exhibit B</u>. In further support of this Motion, the Debtor respectfully represents as follows:

### PRELIMINARY STATEMENT

1. The Debtor is a limited liability company organized under the laws of the State of Delaware and is a registered investment adviser with the U.S. Securities and Exchange

---

[1] The last four digits of the Debtor's federal tax identification number are 0917. The service address for the Debtor is: 1055 Washington Boulevard, 5th Floor, Stamford, Connecticut 06901.

Commission ("SEC"). The Debtor serves as an investment manager and adviser to three related collective investment vehicles organized according to a "master-feeder" fund structure in which substantially all of the assets of two separate funds were invested in a centralized fund. Although the Debtor has ceased active trading on behalf of the Funds (as described below), it previously traded bonds, credit default swaps, and other investments on behalf of the Funds.

2.     Due to a confluence of several factors, the Debtor in its role as investment advisor is confronted with several competing claims against the assets it manages and potential claims against it as an entity because of the alleged fraud of its former member. The Debtor's primary objective is to preserve each of its stakeholders' and potential stakeholders' respective rights, all of which may be asserted before this Court, in a single forum and proceeding, for the potential resolution of those competing interests. In furtherance of this goal, the Debtor has appointed Judge Freeh as its CRO.

3.     As discussed below, the Debtor has recently been named as a defendant in a SEC enforcement action. It now faces several competing claims, potential claims and interests, including those of the funds it manages, the investors in those funds, the SEC and a receiver appointed by the SEC in the underlying action brought by the SEC against a non-affiliated entity. The Debtor owes a duty to the funds it manages, the investors in those funds and its creditors. Nonetheless, the Debtor is cognizant of the competing claims of the SEC and the receiver. The assets of the funds the Debtor manages are currently held in a foreign account. The commencement of this Chapter 11 case and the appointment of the CRO is the only viable option and solution available to the Debtor to fairly address each of these competing interests.

4.     The Debtor seeks to best preserve the pecuniary interests of its stakeholders and potential stakeholders by maintaining the status quo and appointing Judge Freeh, a respected and

trusted representative, as its CRO to guide the Debtor through this process. Judge Freeh is ideally suited to foster an acceptable compromise of these competing interests. For all of these reasons, and as will be demonstrated below, the relief requested in the Motion should be granted.

## BACKGROUND

### A. The Chapter 11 Case

5. On May 6, 2011, the Debtor filed with the Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the above captioned Chapter 11 case.

6. The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. A creditors' committee has not yet been appointed in this Chapter 11 case by the Office of the United States Trustee. No trustee or examiner has been requested or appointed in the Debtor's Chapter 11 case.

### B. The Debtor's Business

8. The Debtor is a limited liability company organized under the laws of the State of Delaware which serves as an investment manager and registered investment advisor to related investment vehicles organized according to a "master-feeder" fund structure. From May 2005 until June 2006, the Debtor served as investment manager to Highview Point Offshore, Ltd., a Cayman Island exempted company established in 2004 (the "Offshore Feeder Fund"). In June 2006, in connection with the reorganization of the Offshore Feeder Fund into a newly created master-feeder structure, the Offshore Feeder Fund contributed its positions to Highview Point Master Fund Ltd. (the "Master Fund"), a Cayman Islands exempted company established in 2006 that has elected to be treated as a partnership for U.S. tax purposes. In 2006, Highview Point, LP, a Delaware limited partnership was also formed (the "Domestic Feeder Fund", and together with the Offshore Feeder Fund, the "Feeder Funds"). The Offshore Feeder Fund was formed for

investment by non-U.S. investors and U.S. tax-exempt investors, whereas the Domestic Feeder Fund was formed for investment by U.S. taxable investors. The Feeder Funds invested substantially all of their assets through the Master Fund (together with the Feeder Funds, the "Funds"). The Debtor also serves as investment manager to the Master Fund. The Master Fund had an investment objective identical to that of the Feeder Funds. The Offshore Feeder Fund and the Domestic Feeder Fund are currently the only investors in the Master Fund.[2] The Debtor's affiliate, Highview Point Advisors, LLC, serves as the general partner of the Domestic Feeder Fund (the "General Partner").

9.     The Debtor provides investment advisory services to the Master Fund and the Offshore Feeder Fund (collectively, the "Cayman Funds") pursuant to certain amended and restated investment management agreements, each dated December 22, 2008 (collectively, the "Agreements"), and had exclusive authority to execute trades and open accounts on their behalf.[3] Beginning in or around June 2006, the Debtor managed the Master Fund, including exercising its authority to make investments on behalf of the Cayman Funds in accordance with the Agreements.

10.     Although the Debtor has ceased active trading on behalf of the Funds, it previously traded investment grade and emerging market bonds and credit default swaps and foreign currency transactions, among other investments. The Funds currently have 41 investors, who have collectively invested in excess of $164 million in principal, net of any redemptions in the Master Fund through the Feeder Funds.

---

[2]     Any references herein to the "Fund" or "Funds" refer to the Master Fund and Feeder Funds, collectively.

[3]     The Debtor has also served as investment adviser to the Domestic Feeder Fund pursuant to a verbal agreement.

#14312696 v1

11.     The founding and current managing members of the Debtor are Frank H. López and Christopher Luth (the "Managing Members"). Each of Mr. López and Mr. Luth hold a 50% membership interest in the Debtor.

### C.     The Debtor's Winding Up

12.     On February 4, 2011, the Debtor was informed by the two largest investor groups in the Funds that they intended to redeem all or a substantial portion of their respective investments. Because these investments comprised a large majority of the Funds' assets, the Debtor determined that it was in the best interests of all investors that the Funds be wound up in their entirety, and that the resulting proceeds be distributed to investors pursuant to the Funds' operating documents. Shortly thereafter, the Debtor began liquidating its securities positions in the Funds. The current net asset value of the Funds is approximately $230 million, held in cash in a custody account at Deutsche Bank, Amsterdam Branch.

13.     On February 18, 2011, the Debtor issued a letter to the Funds' investors notifying them that the Funds would be (a) compulsorily redeeming all investors' shares of the Offshore Feeder Fund, (b) requiring the withdrawal of the capital account balances in the Domestic Feeder Fund, and (c) subsequently winding up the Funds as a legal matter. As stated in the letter, the Debtor intended to distribute the investors' capital in two stages, with approximately 75% of each investor's capital distributed in March 2011, and the remaining funds distributed once all investment positions were liquidated.[4] For reasons discussed below, this initial distribution has not occurred.

---

[4]     As a consequence of the compulsory redemption and required withdrawal, investors in the Funds may now hold claims against, and constitute creditors of, the Funds.

D.  **Events Leading to Filing of the Chapter 11 Case**

14.  In January 2010, the SEC initiated an on-site examination of the Debtor. Thereafter, on January 14, 2011, the SEC filed a civil enforcement action against Francisco Illarramendi, Michael Kenwood Capital Management, LLC ("MK Capital"), and certain affiliates of MK Capital in the United States District Court for the District of Connecticut (the "Connecticut District Court"), *SEC v. Francisco Illarramendi, Michael Kenwood Capital Management, LLC et al.*, No. 3:11-cv-00078-JBA (D. Conn. Jan. 14, 2011) (the "MK SEC Action") for alleged self-dealing at Michael Kenwood.  At that time, Mr. Illarramendi was a former managing member of the Debtor, having voluntarily withdrawn from the Debtor and its affiliates as of July 31, 2010, with a final separation documentation having been executed on November 10, 2010.  On February 3, 2011, John J. Carney, Esq., was appointed receiver in the MK SEC Action to represent the interests of the creditors of MK Capital and related entities (the "MK Receiver").

15.  On March 7, 2011, Mr. Illarramendi pled guilty to multiple criminal counts, including fraud and obstruction of justice in connection with his role as owner and investment manager of Michael Kenwood Group LLC and related entities ("Michael Kenwood", and together with MK Capital, the "MK Entities"), *United States v. Francisco Illarramendi*, No. 3:11-cr-00041-SRU (D. Conn. Mar. 7, 2011).  According to the government, in pleading guilty Mr. Illarramendi admitted that he used money provided by new investors in Michael Kenwood funds to pay out the returns promised to earlier investors in Michael Kenwood funds, and created fraudulent and misleading documents related to the Funds' assets, among other violations.

#14312696 v1

16.     On the same day as Mr. Illarramendi's guilty plea, the SEC filed an amended civil complaint in the MK SEC Action adding charges that Michael Kenwood and Mr. Illarramendi operated a Ponzi scheme.

17.     The Debtor was not named a defendant in the criminal case against Mr. Illarramendi. Nor was the Debtor named a defendant or relief defendant in the original MK SEC Action.

18.     Nevertheless, because the Debtor previously engaged in transactions with Michael Kenwood, on Friday, March 11, 2011, the Debtor, with the consent of its majority investors, voluntarily contacted the staff of the Enforcement Division of the SEC to advise the SEC of the previously planned redemptions. The SEC and U.S. Attorney's Office for the District of Connecticut asked the Debtor to agree to a 30-day standstill before proceeding with the planned redemptions as described in the February 18, 2011 investor communication. The Debtor agreed to the standstill.

19.     As the first standstill came to a close, the SEC and the MK Receiver requested an extension. On April 11, 2011, the Debtor agreed that, *inter alia*, no redemptions of investments would be made for a period of 30 days and with no less than 10 days notice and that the assets of the Funds would remain with their current custodian, Deutsche Bank, Amsterdam Branch, during that time. During the standstill period, certain investors in the Funds threatened to commence a lawsuit against the Debtor if it failed to process the redemptions.

20.     On May 6, 2011, without requesting any further standstill from the Debtor, the SEC filed a motion (the "Motion to Amend") in the MK SEC Action to amend its complaint to

name the Debtor as a defendant, and the Funds as relief defendants.[5]  The Motion to Amend was granted on May 9, 2011.

21.     On May 10, 2011, the SEC filed the Second Amended Complaint.  Also on May 10, 2011, the SEC filed a Motion for a Temporary Restraining Order, Order Freezing Assets and Order for Other Equitable Relief (the "SEC Motion"), in which the SEC requested that the Connecticut District Court grant a temporary restraining order that, *inter alia*, freezes all assets of the Debtor and the Funds (collectively, the "Highview Defendants") and orders the repatriation of assets held by the Highview Defendants outside of the United States, and issue an amended order appointing a receiver to bring the Highview Defendants under the mandate of the MK Receiver.

22.     On May 10, 2011, a telephone status conference was held with the Connecticut District Court in the MK SEC Action regarding the SEC Motion and other issues.  Participants included counsel for the Highview Defendants, as well as counsel for parties appearing in the MK SEC Action and other interested parties.  A hearing on the SEC Motion is scheduled for May 23, 2011.  On May 13, 2011, upon the prior consent of the Debtor and SEC, the District Court presiding over the MK SEC Action entered a temporary restraining order which, *inter alia,* freezes certain assets of the Highview Defendants, and allows for other equitable relief, for the period of time up to and including May 23, 2011 (the "TRO").  The TRO expressly permits the Debtor to satisfy attorney, accounting, auditing and other professional services fees and expenses, employee salaries, and normal and customary expenses to unaffiliated third parties incurred in the ordinary course of the Debtor's business in connection with the Chapter 11 case.

---

[5]      A relief defendant is a party that is not accused of wrongdoing.  *In re D'Angelo*, 409 B.R. 296, 297 (Bankr. D.N.J. 2009) ("In the parlance of civil securities actions, the Debtor is called a 'relief defendant' as distinguished from those accused of wrongdoing who are referred to as 'primary defendants.'" ).  However, a federal court may order equitable relief against the relief defendant where it is determined that the party received ill-gotten property. *United States CFTC v. Healy*, 2011 U.S. Dist. LEXIS 44875, 6-7 (M.D. Pa. Apr. 26, 2011).

#14312696 v1

## JURISDICTION, VENUE AND STATUTORY PREDICATE

23.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

24.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

25.     The statutory predicates for the relief requested herein are sections 105(a) and 363(b) of title 11, United States Code, 11 U.S.C. §§101-1532, as amended (the "Bankruptcy Code").

## RELIEF REQUESTED

26.     Pursuant to this Motion, the Debtor seeks authority pursuant to sections 363 and 105 of the Bankruptcy Code to employ and retain FGIS as its crisis manager in this Chapter 11 case and designate Judge Freeh as CRO of the Debtor, as more fully described below.  A copy of the proposed order (the "Proposed Order") authorizing the employment and retention of Judge Freeh and FGIS is annexed hereto as <u>Exhibit A</u>.  In addition, the Debtor seeks the approval of this Court of the amendment to the Debtor's limited liability agreement, dated as of May 6, 2011 and the Resolution of the Managing Members and the Crisis Manager/Chief Restructuring Officer of the Debtor, effective as of May 6, 2011 and annexed as <u>Exhibit 1</u> to the Proposed Order (collectively, the "Resolutions"), which appoint Judge Freeh as the CRO and set forth the power and duties of the CRO and the Managing Members.

## THE RETENTION OF THE CRO AND FGIS

27.     In an effort to address issues raised by the MK SEC Action and the Debtor's financial condition and to assist the Debtor in resolving these issues in a manner that is in the best interests of the Debtor's estate and creditors, the Debtor recently sought the assistance of a crisis manager.  The Debtor was familiar with Judge Freeh's impeccable credentials as a

#14312696 v1

respected fiduciary, including as a court-appointed examiner in the Chapter 11 case of *In re SemCrude, L.P., et al.*, Case No. 08-11525 (BLS) (Bankr. D. Del.).

28.     The Debtor and FGIS entered into an engagement letter, dated as of May 6, 2011 (the "FGIS Engagement Letter"), a copy of which is attached hereto as <u>Exhibit C</u>.  Pursuant to the FGIS Engagement Letter, Judge Freeh has agreed to serve as CRO of the Debtor.  As CRO, Judge Freeh, with the assistance of his firm, will have direct responsibility for managing the day-to-day affairs and operations of the Debtor and fulfilling the Debtor's obligations as a debtor in possession under the Bankruptcy Code.  The Debtor also expects that Judge Freeh will serve as an intermediary for the competing interests asserted by the SEC, the MK Receiver, the Funds and their investors and the Debtor's other creditors.

29.     On May 6, 2011, the Managing Members adopted resolutions authorizing the appointment of Judge Freeh as CRO of the Debtor.  Judge Freeh accepted this appointment and became CRO on May 6, 2011, subject to Bankruptcy Court approval.

30.     Effective as of May 6, 2011, the Managing Members adopted the Resolutions that, among other things, granted Judge Freeh in his capacity as CRO the power to operate the business of the Debtor in the ordinary course.  Further, under the Resolutions, all actions undertaken by the Debtor outside of the ordinary course will require the prior written approval of the CRO and the approval of the Bankruptcy Court.  As a result, Judge Freeh will have primary responsibility and supervision over the Debtor's operations and conduct.  By taking this action, the Debtor's objective was to vest decision making authority for the Debtor with Judge Freeh. The Debtor's only constraint in vesting exclusive authority with Judge Freeh, are certain limitations known as the "Jay Alix Protocol".  Pursuant to this protocol, Judge Freeh in his

capacity as the CRO remains obligated to report to, remain under the supervision of, and consult with the Debtor's firm governance.

31. The compensation arrangement provided for in the FGIS Engagement Letter is consistent with and typical of arrangements entered into by FGIS and other advisory firms with respect to rendering similar services for clients such as the Debtor.

32. Except as otherwise provided in the Freeh Retention Declaration, FGIS does not have a relationship with any of the parties listed in <u>Exhibit A</u> to the Freeh Retention Declaration in matters related to this Chapter 11 case and does not otherwise have interests materially adverse to the Debtor.

33. The Debtor believes that FGIS is well qualified and able to represent the Debtor in a cost effective, efficient, and timely manner. FGIS indicated a willingness to act on behalf of the Debtor and to subject itself to the jurisdiction and supervision of the Court.

<strong><u>FGIS's Qualifications</u></strong>

34. FGIS was founded by Judge Freeh in 2007 and is comprised of a team of internationally-recognized principals from the judicial, prosecutorial, law enforcement, and corporate domains. In addition to Judge Freeh, the management team of FGIS includes former senior law enforcement officials, legal consultants, accountants, and security and compliance experts. FGIS provides consulting, analysis, and investigative services in a variety of areas, including corporate governance and ethics and corporate monitorships. FGIS has provided crisis management and consulting services for numerous companies, both nationally and internationally, in a variety of circumstances.

35. Judge Freeh is a founder and Chairman of FGIS. Judge Freeh also serves as Senior Managing Partner of the affiliated law firm of Freeh Sporkin & Sullivan, LLP. Prior to founding FGIS, Judge Freeh served as an Assistant United States Attorney in the United States

Attorney's Office for the Southern District of New York. He held positions there as Chief of the Organized Crime Unit, Deputy United States Attorney, and Associate United States Attorney. In 1991, President George Bush appointed Judge Freeh as United States District Court Judge for the Southern District of New York. While serving in this position he was nominated to be the Director of the FBI by President William Clinton. He served in that position from 1993 through 2001.

36.     Following his many years of public service, Judge Freeh accepted a position with MBNA America Bank, N.A., as Vice Chairman, General Counsel and Ethics Officer. In 2005, he served as the company's principal lawyer in connection with the $35 billion acquisition of the company by Bank of America, and in 2007 he formed FGIS.

## Services to be Provided

37.     Under the FGIS Engagement Letter, Judge Freeh will serve as the CRO of the Debtor. Judge Freeh, with the assistance of other FGIS personnel (the "Temporary Staff")[6], will have direct responsibility for managing the day-to-day affairs and operations of the Debtor and fulfilling the Debtor's obligations under the Bankruptcy Code as a debtor in possession. It is also anticipated that the CRO will serve as an intermediary for the competing interests asserted by the various parties including the SEC, the MK Receiver, the Funds and their investors and the Debtor's other creditors. Finally, the retention of Judge Freeh and his firm to manage the Debtor also serves to provide assurance to the Connecticut District Court that a receiver need not be appointed for the Debtor.

38.     Judge Freeh and the Temporary Staff will provide the senior management and crisis management services that the Managing Members and the CRO deem appropriate and

---

[6]     Under the terms of the Engagement Letter, FGIS is also permitted to engage third parties if necessary and appropriate.

#14312696 v1

feasible in order to assist the Debtor during this Chapter 11 case. The Debtor believes that Judge Freeh and the Temporary Staff will not duplicate the services that are being provided to the Debtor in this case by any other professional.

39.     In addition to the ordinary course of duties of a CRO, the duties of Judge Freeh and the Temporary Staff will include, but will not be limited to, the following:

- Execute and file petitions, schedules, lists, motions, affidavits, other applications, any plan, and other documents, and to take any and all other actions which the CRO may deem necessary or proper in connection with the Chapter 11 case in consultation with the Managing Members.

- Assist with bankruptcy administration requirements including, but not limited to, preparation of schedules and statements, developing and producing monthly operating reports, developing a database of claims and liabilities as of the filing date and other mutually agreed upon tasks.

- Assist the Managing Members with the bankruptcy process, including facilitating communications with creditors and other parties in interest including the SEC, the MK Receiver, any official committees appointed by the Bankruptcy Court, and the Court itself.

- Assist in negotiating and mediating with various parties in interest including the SEC, the Debtor's creditors, and the MK Receiver.

- Assist in evaluating the Debtor's options and implementation of a strategy to fulfill the Debtor's duties and obligations to the various applicable constituencies.

- Providing such other similar services as may be requested by the Managing Members.

**Terms of Retention**

40.     The FGIS Engagement Letter provides that Judge Freeh will serve as the CRO, and the Debtor has agreed to compensate FGIS for these services at his current hourly rate of $1,000 per hour.  The Debtor and FGIS agree to employ other Temporary Staff, and the Debtor shall compensate FGIS monthly for the services rendered.  Specifically, the names and hourly rates of the proposed Temporary Staff that are anticipated to work on this matter are as follows[7]:

| Name[8] | Hourly Rate |
| --- | --- |
| Omar McNeill, General Counsel FGIS | $650 |
| Richard Baldwin, Chief Financial Officer, FGIS | $550 |
| Joel Friedman | $600 |
| Thomas Melvin | $300 |

41.     Although FGIS's professionals typically bill in quarter of an hour increments, for purposes of this engagement, Judge Freeh and the Temporary Staff will bill in increments of one tenths of an hour.

42.     FGIS reviews and revises its billing rates from time to time when FGIS believes such adjustments are appropriate.  These adjustments may be reflected in the billing rates applied during the course of FGIS's engagement.[9]

43.     The Debtor will also reimburse FGIS for reasonable out-of-pocket expenses incurred in connection with its retention, including but not limited to fees for lodging, travel, postage, telephone and facsimile charges.

---

[7]     To the extent necessary and appropriate, other third parties including other individuals with Freeh Sporkin & Sullivan ("FSS"), a law firm founded by Judge Freeh and affiliated with FGIS as well as other employees of FGIS, may also work on this engagement.

[8]     Messrs. Friedman and Melvin are attorneys with FSS.  They will not be rendering legal services in connection with this engagement.  Pursuant to an agreement between FGIS and FSS, FGIS will reimburse FSS for the services rendered by Messrs Friedman and Melvin at the hourly rates listed in this chart.  Other individuals with FSS may also work on this engagement.

[9]     In the event the hourly rates set forth herein are adjusted during the pendency of the Chapter 11 case, FGIS will provide the Court and the Office of the United States Trustee with written notice of such new hourly rates.

#14312696 v1

44. Upon approval of the FGIS Engagement Letter by the Court, the Debtor shall promptly remit to FGIS a retainer (the "Retainer") in the amount of $250,000, which shall be credited against amounts due to FGIS on a monthly basis. The Debtor will grant a security interest in the Retainer to FGIS to secure payment of all fees and costs due under the FGIS Engagement Letter and, subject to Court approval, will authorize FGIS to pay itself any fees and costs past due from the Retainer. In the event the Retainer is insufficient to pay for any invoice, the balance will be due within twenty (20) days following the Debtor's receipt of such invoice. Any unused portion of the Retainer will be returned to the Debtor at the conclusion of FGIS's engagement.

45. The attachment to the FGIS Engagement Letter at paragraph 11 includes FGIS' standard indemnification provisions and provides that the Debtor will indemnify the CRO, FGIS, and the Temporary Staff. The Proposed Order, however, recognizes that in accordance with certain protocols implemented and approved by Delaware Bankruptcy Courts during the pendency of the bankruptcy case, these indemnification provisions will be limited to provide indemnification to the same extent as the most favorable indemnification the Debtor extends to its officers or managers.

46. The Debtor does not currently carry director and officer liability insurance. Accordingly, to the extent that FGIS's insurance policies do not cover or are not adequate to fully cover the indemnifiable exposure created by the work to be performed by the CRO and the Temporary Staff under the FGIS Engagement Letter, the Debtor requests that the Court authorize the payment of premiums for obtaining such insurance from the Retainer[10] and the reimbursement of any deductible paid by the CRO or FGIS with respect to a covered claim. The

---

[10] If the Retainer is insufficient to cover this cost, the Debtor seeks authorization to reimburse FGIS for cost of the premiums.

#14312696 v1

Debtor has been advised by FGIS that the anticipated annual premium is approximately $38,000 and seeks authority to reimburse FGIS for this amount.[11]

47.    Because FGIS is not being employed as a professional under section 327 of the Bankruptcy Code, it will not be submitting quarterly fee applications pursuant to sections 330 and 331 of the Bankruptcy Code.  However, FGIS will submit quarterly reports of compensation earned and expenses incurred in connection with its employment by the Debtor, which reports shall summarize the services provided, identify the compensation earned by each executive officer and staff employee provided and itemize the expenses incurred.  Parties in interest shall have the right to object to the compensation within 20 days of FGIS filing its quarterly reports of compensation with this Court.  The first quarterly report shall be due no later than 45 days after the end of the second quarter of 2011 and shall cover the period from the Petition Date to the last day of the calendar quarter.  This procedure will continue at three month intervals thereafter until the conclusion of the case, or unless otherwise ordered by the Court.

## BASIS FOR RELIEF

48.    The Debtor requests that the Court authorize the employment and indemnification of Judge Freeh and the Temporary Staff *nunc pro tunc* to the Petition Date pursuant to the terms of the FGIS Engagement Letter and the Proposed Order, in the ordinary course of business.

49.    Section 363(b) of the Bankruptcy Code provides that transactions outside the Debtors' ordinary course of business may be approved by court order after notice and a hearing.  The retention of interim corporate officers and other temporary employees is proper under section 363 of the Bankruptcy Code.  Courts in this district have routinely authorized the retention of officers utilizing this provision of the Bankruptcy Code.  *See, e.g., In re New Stream*

---

[11]    Under the applicable insurance policy, there is a $25,000 deductible for any covered claim.  By this motion, Judge Freeh and FGIS are also seeking entry of an order requiring the Debtor to reimburse them for any deductible paid with respect to a covered claim.

*Secured Capital, Inc., et al.*, Case No. 11-10753 (MFW) (Bankr. D. Del. April 8, 2011); *In re International Garden Products, Inc.*, Case No. 10-13207 (Bankr. D. Del. Nov. 4, 2010); *In re Consolidated Horticulture Group LLC*, Case No. 10-13308 (Bankr. D. Del. Nov. 29, 2010); *In re Zohar Waterworks, LLC*, Case No. 09-11179 (Bankr. D. Del. April 23, 2009); *In re Broad Stripe, LLC et al.*, Case No. 09-1006 (CSS) (Bank. D. Del. January 26, 2009); *In re Fairfield Residential, LLC et al.*, Case No. 09-14378 (BLS) (Bank. D. Del. January 13, 2009); *In re DBSI, Inc.*, Case No. 08-12687 (Bankr. D. Del. Dec. 17, 2008); *In re VeraSun Energy Corp.*, Case No. 08-12606 (Bankr. D. Del. Dec. 9, 2008; *In re WorldSpace, Inc.*, Case No. 08-12412 (Bankr. D. Del. Nov. 10, 2008); *In re Hoop Holdings, LLC et al.*, Case No. 08-10544 (BLS) (Bank. D. Del. April 22, 2008); *In re Hilex Poly Co. LLC et al.*, Case No. 08-10890 (KJC) (Bank. D. Del. January 30, 2008); *In re Dan River Holdings, LLC*, Case No. 08-10726 (Bankr. D. Del. May 19, 2008), *In re Mortgage Lenders Network USA, Inc.*, Case No. 07-10147 (PJW) (Bankr. D. Del. Feb. 28, 2007); *In re Global Home Products, LLC*, Case No. 06-10340 (KG) (Bankr. D. Del. May 4, 2006); *In re Meridian Automotive Systems-Composite Operations, Inc., et al.*, Case No. 05-11168 (MFR) (Bankr. D. Del. July 19, 2005); *In re Cable & Wireless USA, Inc.*, Case No. 03-13711 (CGC) (Bankr. D. Del. Jan. 16, 2004).

50.     Once a debtor articulates a valid business justification, "the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.'" *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. VanGorkom*, 488 A.2d 858, 872 (Del. 1985). The business judgment rule has vitality in Chapter 11 cases and shields a debtor's management from judicial second-guessing. *Id.* (quoting *Smith v. VanGorkom*, 488 A.2d 858, 872 (Del. 1985); *In re Johns-Manville Corp.*, 60 B.R. 612,

615 (Bankr. S.D.N.Y. 1986) ("The [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

51.     Here, the employment of FGIS and the designation of Judge Freeh as the CRO is a sound exercise of the Debtor's business judgment.  Judge Freeh and the Temporary Staff have extensive experience as senior officers for several large companies, as well as experience in the areas of forensic accounting, corporate governance and SEC compliance matters.  Judge Freeh and the Temporary Staff, working in conjunction with the Debtor's Managing Members, will provide invaluable assistance in the Debtor's efforts to (i) manage the Debtor's financial and treasury functions and address the SEC enforcement action pending against the Debtor, (ii) analyze the Debtor's financial condition, (iii) analyze the Debtor's strategic alternatives, (iv) negotiate with the Debtor's creditors and parties-in-interest, (v) act as an intermediary among the Debtor's creditors and the various other parties-in-interest, including the SEC and the MK Receiver, and (vi) assist with the preparation of a Chapter 11 liquidating plan.

52.     The Debtor is cognizant of the competing interests at stake with respect to both the current management of the Debtor's finances and the ultimate outcome of this Chapter 11 case.  The Debtor believes that obtaining the most favorable outcome for its creditors will require skillful mediation of those interests led by a highly respected, capable, and trustworthy individual.  The Debtor believes that Judge Freeh and FGIS will be able to provide such services for the benefit the Debtor's estate and creditors.

53.     In view of the foregoing, the Debtor respectfully submits the statutory predicates for the relief sought herein are sections 363 and 105 of the Bankruptcy Code and that the requirements to retain FGIS have been met.

## NOTICE

54.     Notice of this Motion has been provided by first-class mail, postage pre-paid to: (a) the Office of the United States Trustee for the District of Delaware; (b) the creditors holding the 20 largest unsecured claims against the Debtor's estate, as identified in the Debtor's Chapter 11 petition; (c) the SEC; (d) the MK Receiver; and (e) all parties that have, pursuant to Bankruptcy Rule 2002, formally appeared and requested service of pleadings.  In light of the nature of the relief requested, the Debtor submits that no other or further notice is necessary.

## NO PRIOR REQUEST

55.     No prior request for the relief sought herein has been made by the Debtor to this or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

#14312696 v1

WHEREFORE, the Debtor respectfully requests that this Court: (a) enter of an order substantially in the form attached hereto as Exhibit A granting the relief requested herein; and (b) grant to the Debtor such other and further relief as the Court may deem proper.

Dated: May 21, 2011                         Respectfully submitted,
Wilmington, Delaware

/s/ Evelyn J. Meltzer
David B. Stratton (DE No. 960)
Evelyn Meltzer (DE No. 4581)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street, P.O. Box 1709
Wilmington, Delaware 19899-1709
Tel.:  (302) 777-6500
Fax:  (302) 421-8390

- and -

Gary S. Lee
Carl H. Loewenson, Jr.
Melissa A. Hager
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

Proposed Attorneys for the Debtor and Debtor in Possession

#14312696 v1